In this case, Israel Bornstein is administrator of the estate of Amit Bornstein v. Monmouth County, et al. Mr. Borman Good morning, your honors. May it please the court, Ken Borman for the plaintiff, Israel Bornstein. I'd like to request three minutes for rebuttal time. I request to be granted. Thank you. I'd first like to start with the deliberate indifference claim with regard to Mr. Bornstein's immediate medical needs. Which, as against which defendants? Both. I'll start with the county and then I'll go to CCS. You never pled any deliberate indifference claim in your complaint, did you? That's correct. And it was one sentence, as I read it, it was only one sentence in an 80-90 page pre-trial order, was it? It was one sentence in the pre-trial order, which was underneath the factual circumstances. But Judge Thompson held, I mean she specifically ruled that the deliberate indifference claim was properly pled. She ruled that several times. She just didn't think that the evidence was sufficient to establish it. Well, what evidence was there? I mean if you're requesting at the time of a jury instruction or on the fourth day of trial a deliberate indifference claim, I mean one time it was brought up by a juror, what's the claim here? Doesn't there have to be some testimony elicited from witnesses as to the medical needs as compared to excessive force? I would agree with that, yes. And what was elicited? To my knowledge, the record really focused on the excessive force claim, not on what these officers did vis-a-vis the medical unit. Well, the main thing was that he complained consistently that he wasn't able to breathe. By the time that he was complaining, he was in a nursing unit, was he not? He was, from what I understand, he was initially in the booking area. Nurse Harvey recorded that he had difficulty breathing. But it didn't last very long. He was booking at the nurses' stations from 5 to 5.13. I mean he was put into medical care pretty quickly. He was put into medical care. He was treated by a nurse bond shortly thereafter. And so was there a contention at trial that somehow the MCSOs delayed or did something vis-a-vis medical needs that wasn't appropriate? The spit mask. Putting the spit mask on him after he was pepper sprayed. The regulations clearly stated that when you put an inmate in a restraint chair, a spit mask should not be used on a prisoner who is having problems breathing or is bleeding. Okay, but there were experts for the defense. Dr. Perkel said this was entirely appropriate, and I don't know that you had any expert on your side that said it wasn't. Dr. Batten. You know, Dr. Batten talked about causation. Absolutely, there's not no contention anywhere in the record that he was speaking to standard of care. He clearly abandoned that. This wasn't with regard to the standard of nursing care. This was just with regard to putting a spit mask on somebody who was pepper sprayed. Batten did not testify with respect to that. He testified with respect to causation. He specifically disavowed his testimony as having nothing to do with the standard of care. Well, I'm not talking about the standard of nursing care. I'm just talking about the jail restraint policy, and Batten did testify that putting a spit mask on this boy who was pepper sprayed caused him to asphyxiate. Well, on the merits, assuming the claim is properly before the court, he's seen a nurse, he's in a facility there. How can you say this is a deliberate indifference to his medical needs when he's actually involved with the nursing care and the medical care right there? Well, the nurses saw that he had a spit mask on his face. The nurses, all the nurses, not all the nurses, Nurse Harvey, she recorded in her notes at page 2944 of the record that Mr. Bornstein had trouble breathing. Nurse Barton, while she was responsible for monitoring Mr. Bornstein, Dr. Batten noted that she took into account that he had trouble breathing, and she also observed blood splatter in the spit mask. Nurse Bruce observed that Bornstein was bleeding in the spit mask. I don't know if I had that in my brief, but that's at page 2719 of the record. But the point is he's in a medical facility. He's seeing people. I'm not saying the treatment is proper or is not negligent. I'm not saying it is or not. But he's not alienated from medical care. That's true. But when they had the second use of force incident, he was alienated. I mean, they never informed Crystal Barton of the second use of force incident. Well, with the force situation, that's another story. They had no idea where this man came from that had this tremendous strength out of nowhere, which was highly unusual. It got unheard of. And that's another issue of the case. But as an indifference claim, it's a little hard for me to fathom. When he's seeing all these medical care people, perhaps they're not doing the right thing. I don't know. Because there was no expert testimony from your point saying that it was medically inadequate. Understood. Your doctor, as Judge Reddell brought out, declined to be an expert in that area. That's correct. And so where are you going with this indifference claim? Well, Dr. Batten, he performed the autopsy, I believe, five days after the incident. He was the only other doctor that examined Mr. Bornstein's body. He found aspirated blood in his air passages. He found that the lungs were twice the weight of normal lungs. Normal lungs weighed 600 grams. Mr. Bornstein's lung weighed 1,100 grams. But what does this have to do with the fact that if you were going to contend that deliberate indifference was in the case, that you should have been urging that at the outset in your opening statement? You should have amended your complaint. It should have been somewhere other than a one line in a final pretrial order. Again, Judge Thompson never – the final pretrial order was never amended by Judge Thompson. And nobody, from what I understood, argued that it was not specific enough. They just argued that we didn't pursue that line throughout litigation. But what you do in a situation like this is you analyze. You say, okay, there was the complaint, and then the final pretrial order added something. Then you look at prejudice. And would you not concede that if someone had been examining witnesses, not knowing that deliberate indifference was the thrust or one of the aspects of the case, that they're having conducted the trial in a manner that they're defeating just the medical malpractice claim and excessive force claim, it would impact the process of the trial and they'd be prejudiced. Would you agree or would you disagree with that? I disagree, and I'd just like to refer the Court to page 2728 of the record and page 10 of the defendant's joint appendix, where Judge Thompson ruled that the issue of whether the defendants were deliberately indifferent to Bornstein's immediate medical needs was properly planned in the pretrial order. Was properly what? Properly planned in the pretrial order. All right. So let's go right to the merits that we dropped with Mrs. Mililano. You have to have some expert testimony saying that there was something that was indifferent here from what should have been done. And you don't have any expert testimony at all in that regard, do you? Unless you're saying this proves itself in some way. But you have no medical experts that said that the care here given was indifferent to the need of a medical situation like that he faced. That's true. I mean, with regard to the standard of medical care. So what do you know with the claim if you have no proof from which a judge would require that a jury find it when a jury couldn't do it if there wasn't any proof of it? The regulations. The regulations clearly set forth the standard of care. The regulations stated that you're not supposed to have a spit mask. But then you need an expert to say that the care he received was in violation of the regulation. And you have no proof here. Commissioner Horne. He clearly stated that that was a violation of the regulations. Did Commissioner Horne testify in this case? Yes. He testified at page... He testified that the care given was inadequate under medical... Not with regard to medical needs, but with regard to putting a spit mask on him, after he was placed in the restraint chair at 2774 of the record, clearly states that a spit mask should not be used on a prisoner who's bleeding or having difficulty breathing. That's clearly... Even taking the expert testimony aside, the regulations, to my argument, that it sets forth the standard of care. And Baden's autopsy found that the failure to comply with these regulations caused his death. It caused him to asphyxiate. If the spit mask wasn't used, a jury can infer that he would have asphyxiated to death. Mr. Gordon, your time is running. I'd like to hear something about your 403 argument here, which was in the center of most of the litigation here, as to whether or not his use of drugs was improperly brought... Improperly brought, not overused and abused by the government. Yeah, the issue of the steroids is only relevant with regard to what caused his coronary artery disease. Dr. Baden adopted Dr. DiCarlo's findings that he had coronary artery disease. He said right at the outset that we weren't going to dispute that he had coronary artery disease. Therefore, the issue of steroids was not relevant. We had no idea if he used them. We had no idea when he used them. We had no idea how much he ever used. It wasn't in his system. But it was such a pervasive issue at the trial. In Dr. Mannion's testimony that doctors are trying to get high school kids off of steroids, the jury's questions to Dr. Mannion show that this was considered. When the jury asked Dr. Mannion how long steroids stayed in your system, so it would no longer appear in the toxicology report, I think he answered, people try to sell steroids that will gain the system. And that's at page 2966 of the record. When the jury asked Dr. Mannion about drug rage, he stated that when professional athletes go off the deep end and murder their family associates and commit suicide, this was testimony that should never have been in front of the jury. Well, there's no question this testimony was very damaging and prejudicial. But the government, the mob of counties, the sheriff's office, their position is that they had to bring this in. It was relevant to demonstrate the problem that they confronted, which was the tremendous strength of this very young guy and his aberrational behavior based upon what he was facing. And the causation, too. Whether his problems were caused by his own doing and not by natural events, why wasn't it relevant? And why was the prejudice so overwhelming that it should have been excluded by the district judge? If there's less prejudicial means of getting a point across, I think those means should be taken. I mean, the issue wasn't what caused the coronary artery disease. The issue was whether the coronary artery disease was the sole proximate cause of his death. We considered that he had coronary artery disease. So there was really no reason to bring the issue of steroids in. And that's like saying you take a drug at some undetermined amount of time in the past, you're going to have those effects in the future at any time. It's like saying I take cocaine and I'm going to be up for the rest of my life. It doesn't make any sense. There was no evidence that he had. I mean, he had no steroids in his system. And if they want to talk about his strength, all they have to do is say that he was strong. Well, the jury saw the video, did they not? Yes, they did. So, I mean, two plus two is four. Correct. To figure that out. It looks like my time is up. You're arguing on the floor three that it's prejudicial. You're not arguing that it's not probative or relevant, are you? I'm arguing that it's irrelevant because it's completely speculative. I'm also arguing that it's prejudicial and the less prejudicial means of getting that point across. But once they have a doctor testify as to the tamoxifen use, that really takes the speculation out, doesn't it? Yes, but the tamoxifen use had no effect on his heart. And just because he was using tamoxifen doesn't show when he last used steroids. I mean, there was testimony that steroids could last in your system for a few days, several months. Nobody knew. Now, if there were steroids in his system, I could understand that argument being made. All right. Thank you, Judge. Thank you, Mr. Chairman. We'll have you back on rebuttal. Mr. Gorman. Mr. Baer. Should I wait or go? Okay. Good morning, Your Honors. May it please the Court, should I wait or go? Sure. Yeah, just wait. Okay, I'll wait. Thank you. Good morning, Your Honors. May it please the Court, Andrew Baer from the law firm of Luck-Walrath LLP and Special Monmouth County Counsel on behalf of the Monmouth County Defendants' Appellees. The jury in this matter, after a 12-day trial, entered a verdict in favor of the Monmouth County Defendant Appellees finding an excessive force was not committed against the defendant. The jury didn't hear any deliberate indifference claims. And don't you have a real – I mean, we were pretty tough on your colleague, but don't you have a real problem because the final pretrial order here specifically laid out a deliberate indifference claim under the Constitution of the United States? Yes, Your Honor. I mean, and the case law, you know, is all over the lot here. A lot of the case law says that it supersedes the complaint, you know, and there was evidence about the spit mask shouldn't have been used, the policy. You know, was Judge Thompson right to say, oh, well, there's just no evidence to support this and we're throwing it out? Well, I think the argument – Did she serve the role of the jury? Yeah, I think the argument is twofold, Judge. One is that if a plaintiff can amend a pleading after a case is three years old at a pretrial order and not assert it during the pretrial discovery process, in this case every sheriff's officer was deposed, every CCS, the nurses were deposed, the doctor was deposed. Did you on appeal, did you cross appeal contending that Judge Thompson was in error in saying that even though it wasn't pleaded in the complaint, it was properly asserted in the final pretrial order and that that was erroneous? Well, I think she said different things in a couple of different places. I think at one point she said that, but then she also ruled that based on procedure, that it wasn't brought in conformance with the pretrial discovery orders as well as on substance, that it was improperly before the court at that time. Well, and she said, you know, there really is no deliberate indifference because that's usually a lengthy time period, et cetera, et cetera. I mean, those kind of rulings, I'm not sure they were correct, and yet I don't think you complained about them on appeal. So we're left with whether she was right that the lack of evidence, which Mr. Gorman has challenged. Right. Well, twofold. One is that, again, during the pretrial discovery process, if in fact there was this claim, we would have, A, pursued it in discovery and, B, obtained an expert report. Well, for our purposes on appeal, I think you should assume it's in the case. Got it. And don't tell us what you would have done if it wasn't. You didn't object to it in the pretrial order? Quite frankly, I think as the court pointed out, it was a sentence in a 92-page pretrial order. Consider it part of the case. I understand, Your Honor. I think from the county's perspective, twofold. The evidence before Judge Thompson was correct on the substance because, one, the county hired CCS to perform full-time medical services at the jail. They were there. In this case, in order to pursue or prove a deliberate indifference claim, you need to show, A, serious medical need and, two, that there was an indifference to that. Here, as Your Honor has pointed out earlier, when Mr. Borstein came into the jail, the first thing after his process that he did was he saw a nurse. Then he went back up to the front desk, came back. There was use of force. He saw a nurse again downstairs. Then he went up to the medical unit where he saw an RN. But nobody told the nurse about the second altercation. I'm not quite there yet. But, yes, he saw an RN. The RN calls a doctor. The doctor prescribes Ativan and says he should calm down. Then, when being put into the constant watch cell, there was a use of force again. The testimony was that the constant watch cell is in the medical unit of the jail. That testimony was before Judge Thompson and the jury. And that the nurses literally were like the nurse who was monitoring Mr. Borstein, who was supposed to actually, who was charged with monitoring him after the use of force, was outside the jail cell where he was in and or could have went in to see him. She chose not to because she was afraid of him. But, at the end of the day, there was significant medical care given to him. The idea that there was a claim, a viable claim of deliberate indifference, doesn't fly in the face of those facts. In terms of the steroids, there was, steroids were in this case from the outset, before there even was litigation. The medical examiner found in his autopsy report the presence of tamoxifen. And in his autopsy report, he indicated the presence of tamoxifen in Mr. Borstein's blood indicates he used anabolic steroids. That's before the litigation started. So that was a finding that the medical examiner made just in performing his official duties. And then that was followed up by testimony from Dr. Perkel as well as Dr. Mannion about the significance of the presence of tamoxifen. But isn't Dr. Mannion's reference to a royal rage and athletes going off the deep end, isn't that unnecessarily prejudicial? Well, that came from a question. That came from the direct examination. But as I recollect, and I don't think the record reflects, the plaintiffs at the time didn't object to the testimony either. They're complaining about it now on appeal. But there was no objection at the time to strike or bar the testimony. I think also what this court needs to look at is that in terms of what the standard of review is, in terms of was the decision of Judge Thompson arbitrary, fanciful, or capricious to allow that. And given that plaintiff through four days of trial was alleging wrongful death, that wrongful death claim was in the case. Again, the claims vacillated and varied from once the trial started. But the wrongful death claim was in the case four days through trial. That was as a result of excessive force, the wrongful death, correct? Yes. Well, they were alleging wrongful death. And the point was is that in that sort of claim, the damage is if the plaintiff would have lived to whatever, he would have an expert, which they didn't have. But if the plaintiff could have lived to age 80, what would their damage have been as a result of the wrongful death? And in that context, too, you have causation issues. And in the context of a 1983 claim that was in the excessive force claim, you have, as Judge Thompson pointed out below, there are causation issues as well as to what caused his death. And in this case, the jury, and really it was a very active jury, and they had questions for every witness. It was kind of interesting at the time. It seemed like there must have been some lawyers on the jury. There wasn't, actually. Really? But it was certainly like it was a CSI episode where they're trying to figure out the cause of death. And if you have the idea that there's tamoxifen in the system, then why was it there and why did the medical examiner find it? The context of, well, the only reason that a young male would be taking tamoxifen is because he would be cycling on anabolic steroids is the answer. And to preclude that sort of testimony would have defied the science. And, you know, they were interested in the science, and it wasn't overly prejudicial. At the end of the day, there was an exertion. He had significant cardiac disease, and he died suddenly. And they wanted to know why. Well, you know, the cause of death, as you espoused, are his own doings. But it seemed to me that the county overplayed the drug situation here. It played up to it fairly well, that they went overboard with it. And that's the question that the plaintiff is saying here. And once you introduce drugs, drug use, well, the jury is not so hot on that type of thing by anyone. So what's wrong with their basic claim is that they want a new trial, and they don't want you trying a drug case. They want you to try a wrongful death and a survival case and an excessive force case and an indifference case. Because I'm going to read all this drug stuff here. I thought I was in a drug trial here, and it turned out to be nothing to do with drugs. So what's wrong with their claim? Well, two points. One is that, first of all, there is no challenge on appeal of the jury's finding here, one. No, no. We know what the jury found. We're saying that the jury had evidence before him which prejudiced those findings. Now, what's wrong with that? I would respectfully disagree with Your Honor's characterization of the record. There was, I can tell you that in my hour-and-a-half closing, the use of the word antibody, steroids, came up in one sentence, because I reviewed the closing last night. So we didn't certainly harp on it as an argument in closing, one. And two, again, the science and the medical, this is not a drug case where you're having, like, there's a use of cocaine or marijuana and how it relates to the behavior in a crime. This is what was the plaintiff's decedent's medical condition and what caused his death. So I think that is very different than the kind of drug cases that the appellant cited, and we point that out in our brief as well. Okay. Thank you, Your Honor. Thank you, Mr. Baer. And Ms. Solomon. Good morning, Your Honors. May it please the Court, I am Catherine Her-Solomon on behalf of the defendant Correct Care Solutions. With respect to the deliberate indifference claim, the plaintiff never, the initial amended complaint against Correct Care did not include a 1983 claim. The plaintiff was under the impression that he had asserted this claim, because he included that argument in motion practice. But at two points. Also put it in the final pretrial order. Right. Which you signed. Right. So it's in the case. Well, I would say that the trial court properly declined to blindly apply the rule that the final pretrial order supersedes the plea because of the procedural history. The plaintiff argued in motion practice that he had, that was his claim. In two orders, one dated in September of 2014, one in November 14, the court explicitly indicated that this claim against Correct Care is limited to medical malpractice. And he actually moved to amend the complaint. Exactly. And Judge Arleo ruled against him on that. Right. Three weeks prior to trial. After including it in the final pretrial order, made a motion to amend the complaint to add the claim. Not, and omitting from the motion that it was included in the final pretrial order. I mean, so we have two different situations involving the NCSO and your situation. And they were handled totally differently in the district court, it seems to me. Right. Well, from our perspective, the fact that it was never included in the initial complaint, the amended complaint, again, Correct Care solutions. And I would argue that the reasoning supporting the denial of the motion to amend also supports the refusal to permit the plaintiff to pursue the claim at trial, despite the fact that it was included in the final pretrial order. The plaintiff never explained why, never mind showed good cause, never gave a single reason explaining the delay in asserting the claim. As noted by my adversary, the case had proceeded through discovery motion practice and Correct Care solutions was defending only a medical malpractice claim. Well, and there was a specific deadline for amending the complaint. Exactly. Why don't you get to the merits of that claim, just briefly. Well, the plaintiff didn't allege it's against a corporation. He didn't sue any individual Correct Care solution employees. He failed to allege a customary practice of Correct Care that deprived the decedent. Do you agree that the so-called equivalency test requirement does not apply against nurses and social workers? I would agree. All right. Well, Commissioner Horne and Braden, Dr. Braden, to testify regarding the question of negligence. Well, Dr. Braden was not precluded in any way. Well, I figured he wasn't allowed to testify as to the propriety of the care. Well, the procedure went as follows. Correct Care made a motion to eliminate to preclude Dr. Bodden. The motion was pending at trial. Then when plaintiff presented, asked the court to certify him as an expert, the court questioned what will he be testifying about. Plaintiff responded, cause of death. And then he inserted a vague, you know, he has experience in prison medicine. And then he backtracked and said it would be cause of death. And then the judge invited plaintiff. If he thought one of Dr. Bodden's opinions would be relevant, then we'll take it outside, Nora, and we'll discuss whether he will be permitted to render the test, proffer the test. Well, my question, I mean, I'll leave that to one side. I don't see why it was questioned that these, there are the equivalency requirement doesn't apply. But the appellant's main argument here is the state of care was clearly set forth in the prison regulations. So it didn't even need an expert, for God's sake. Well, this is not a common knowledge case. This is regardless of, even if the standard, even if the regulations are the standards. Dr. Bodden was never asked, did the nurses deviate from the standard of care? Did the nurses not treat this patient properly given the regulations? Those questions were not asked. This is not a common knowledge case? No. You mean to tell me, we can conclude, it's not common knowledge that you don't put over someone's face when they can't breathe and they're bleeding? It's not common knowledge you don't put a mask over their face? That's not common knowledge? Well, the mask provided airway. And there was no expert testimony that under the circumstances of this case where the nurse is treating the inmate, she took off the mask. She wiped his face. When he became aggressive, that's when the correction officers put the mask back on his face. There's not a single piece of testimony that says that the nurse can't breathe. Why was the prison mask necessary to stop the aggression? Well, it was necessary to prevent the nurses from being exposed to the blood and the spit of the inmate. And according to the defense experts, all of the treatment and conduct of the nurses and the staff was completely appropriate, and there's no contradictory testimony. All right, talking about experts, why wasn't Commissioner Horn allowed to opine about the fact that your client acted unreasonably? His report included opinions on medicine and the standard of care. He was a use-of-force expert. He had absolutely no experience in nursing. Well, I don't know if there's anybody with more experience than Commissioner Horn in penology. Well, in – And certainly medical care is part of – a major part of prison conditions. He was ahead of the New York correctional system. He was ahead of Pennsylvania in various and sundry places. He was more qualified than him. Well, but he didn't have medical training or medical knowledge. He was opining merely about whether or not your client acted reasonably or whether they acted unreasonably. And does he have to have – does he need to be a medical expert to give that kind of opinion on prison conditions and what the proper steps that prison officials should take? I think under these circumstances he did. There was an inmate, and there were specific circumstances of how this inmate was acting. And the question was should the nurses have recognized that he was suffering a heart attack, that he was suffering allegedly a grand mal seizure. Those kinds of questions require specialized knowledge of a medical personnel. Okay. I understand your position. Not that I agree with it, but I understand. Unless there are any further questions, I'd be happy to rest on my brief. Thank you. Thank you. Mr. Gorman? Just briefly with regard to my colleague's assertion that it was one statement with regard to steroids and summation, I want to refer the Court to page 20 and 21 of my main brief. We have seven paragraphs dedicated to the issue of steroids and summation. And I'll – there's no need for me to get into it. I think the record speaks for itself. With regard to the medical care, I just want to emphasize that after the second altercation, he was given no medical treatment whatsoever. And even though it happened in the medical area, Crystal Barton testified that the reason why she didn't go into the constant watch room initially was because no one told her about the altercation. She was under the opinion that he already received medical care and that was it. It was an intervening act. And under those circumstances, if she just went in and did vitals, maybe this would have turned out differently. And I think that's – I think the record speaks for itself. I think my briefs adequately address these arguments. If the Court has any other questions, I'm happy to ask them. Thank you very much, Judge. Thank you. Thank you, Mr. Gorman. Thank both – and all counsel. Thank you. Thank you, Your Honor. For their arguments in this case, we'll take the matter under advisement.